UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AYDER KURTIEV                          )
7171 Woodmont Avenue                   )
Bethesda, Maryland 20815,              )
                                       )
              Plaintiff                )
                                       )   C.A. No. _____
vs.                                    )
                                       )
JEFF SHELL,                            )
Chair                                  )
Broadcasting Board of Governors        )
330 Independence Avenue, S.W.          )
Washington, D.C. 20237,                )
                                       )
Broadcasting Board of Governors        )
330 Independence Avenue, S.W.          )
Washington, D.C. 20237,                )
                                       )
Defendants.                            )
_____)

COMPLAINT

Plaintiff Ayder Kurtiev ("Mr. Kurtiev"), by counsel, hereby complains and alleges as follows:

I. NATURE OF CASE

1.    This is an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq., by Ayder Kurtiev against Defendant Jeff Shell, the Chair of the Broadcasting Board of Governors, and Defendant the Broadcasting Board of Governors, for unlawful discrimination and retaliation for protected anti-discrimination activity.

2.    Mr. Kurtiev was the victim of unlawful retaliation for engaging in protected anti-discrimination activity when his employment as head of the Russian Service (i.e., Managing Editor) at the Voice of America was unlawfully terminated.  His employment

was terminated after he engaged in protected anti-discrimination activity by refusing to lie as directed in an affidavit during an investigation of a discrimination case and for questioning false information given him concerning the purported reason for terminating the employment of the employee who filed the discrimination case that led to the termination of her employment.

## II. JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over the claims under 28 U.S.C. §1331 and 28 U.S.C. §1337.

4.    Venue is proper in this district by virtue of 42 U.S.C. §2000(e)-5(f)(3) because the unlawful employment practices alleged were committed in this district and by virtue of 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  Mr. Kurtiev was employed by Defendant at Voice of America headquarters in the District of Columbia and his employment records were kept in the District of Columbia.

## III. THE PARTIES

5.    Plaintiff Ayder Kurtiev ("Mr. Kurtiev") is a resident of Montgomery County, Maryland.  Mr. Kurtiev worked for the Voice of America from on or about June 22, 2009 until on or about April 24, 2010.  His employment was terminated after he engaged in protected anti-discrimination activity by refusing to lie as directed in an affidavit during an investigation of a discrimination case and for questioning false information given him concerning terminating the employment of the employee who filed the discrimination complaint.

2

6.    Defendant Jeff Shell is the Chair of the Broadcasting Board of Governors.  He is sued in his official capacity.

7.    Defendant Broadcasting Board of Governors is an independent federal agency responsible for all U.S. government and government sponsored non-military international broadcasting.  The Voice of America is one of Defendant's broadcasters (i.e., component organizations).  It is headquartered in Washington, D.C. The Broadcasting Board of Governors is subject to the civil rights laws of the United States, including Title VII of the Civil Rights Act of 1964.

## IV. <u>FACTS</u>

8.    Mr. Kurtiev is a naturalized citizen of the United States.  He is from Uzbekistan, now an independent nation but formerly part of the Soviet Union.  His ethnic background is Crimean Tatar and he is a Muslim.  His native language is Russian, and he was educated in Russian language schools in Uzbekistan.  He comes from an educated family and his mother is a medical doctor. His family was exiled to Uzbekistan during the Stalin era as collective punishment, and lived in what is now Uzbekistan with even fewer rights than other citizens of the Soviet Union.

9.    Mr. Kurtiev has a masters degree in mass media management from a university in the United States.

10.    Mr. Kurtiev, while working in Uzbekistan, advocated for human rights and journalistic freedom.

11.    As a result, he was forced to seek political asylum in the United States, which was granted.

12.  Mr. Kurtiev began employment with the Voice of America as the head of the Russian Service on or about June 22, 2009.

13.  Mr. Kurtiev was very well qualified for the position because of his journalistic background and education, his native level Russian, and his fluency in English.

14.  Mr. Kurtiev performed extremely well in his position as head of the Russian Service.

15.  Many employees in the Russian Service at the Voice of America were Russians (i.e., natives of Russia), and many of them did not speak good English.

16.  Many of the Russians in the Russian Service at the Voice of America harbored extreme racist attitudes towards those from Uzbekistan and other Central Asian Republics.

17.  Many Russians in the Russian Service at the Voice of America never accepted Mr. Kurtiev as the head of the Russian Service because of their racism, finding it completely unacceptable to be supervised by a member of what they considered an inferior ethnic group.

18.  Many Russians in the Russian Service made crude racist remarks about Mr. Kurtiev, his ethnic origin, and his religion.

19.  The crude racist remarks included referring to Mr. Kurtiev as a Russian word which is literally translated as "wood" or "log" and which means that the person is "dumb, uneducated, and lacking in culture."

20.  The crude racist remarks about Mr. Kurtiev also included referring to him as a Russian word which is literally translated as

4

"black ass," a reference to his slightly darker skin color and which means that the person is "uncivilized, uneducated, and savage."

21.   In or about May 2009, just before Mr. Kurtiev began his employment as head of the Russian Service, Najia Badykova, a long-time contractor for the Russian Service, and a Muslim from Turkmenistan, was not selected for two full time positions in the Russian Service at the Voice of America.

22.   In or about July 2009, Ms. Badykova filed a Formal Complaint alleging that her non-selection was because of discrimination.

23.   Ms. Badykova's complaint named Elez Biberaj and Sheila Gandji as discriminating officials.  John Lennon's role was also at issue in the case.

24.   In or about early August 2009, Sheila Gandji, whose role at the Russian Service included overseeing financial matters, told Mr. Kurtiev that the Russian Service was facing financial problems and had to let some contractors go, including Najia Badykova.

25.   Mr. Kurtiev did not know that Najia Badykova had filed a discrimination complaint against Sheila Gandji and Elez Biberaj at that time.

26.   Mr. Kurtiev was short on staff and did not want to lose Najia Badykova.

27.   Mr. Kurtiev approached Elez Biberaj, his immediate supervisor, trying to save Najia Badykova's job.

28.   Elez Biberaj confirmed that they had to let Najia Badykova go.

29.   On or about September 1, 2009, Mr. Kurtiev participated in a meeting convened by his supervisor Elez Biberaj, about contractors in the Russian Service.

30.   The meeting participants included Mr. Kurtiev, Elez Biberaj, Sheila Gandji, and Karine Roushanian, an officer in charge of "mentoring" in the Russian Service.

31.   At the meeting, the decision was made not to renew Najia Badykova's contract.

32.   Mr. Kurtiev participated in the meeting, without knowing about Najia Badykova's discrimination complaint against Elez Biberaj and Sheila Gandji, and without knowing the true situation about the finances of the Russian Service, having received only false and misleading information from Elez Biberaj and Sheila Gandji.

33.   Mr. Kurtiev went along with the decision not to renew Najia Badykova's contract, based on false and misleading information about purported "budget constraints" and without knowing about Ms. Badykova's discrimination complaint.

34.   About two months later, in sworn affidavits for Najia Badykova's discrimination complaint, both Elez Biberaj and Sheila Gandji falsely claimed that they had no role in the decision to terminate Ms. Badykova's employment by not renewing her contract. Mr. Kurtiev did not find out about the affidavits until much later.

35.   On or about November 5, 2009, Mr. Kurtiev received written questions from an investigator for Najia Badykova's discrimination and/or retaliation case.

36.   Mr. Kurtiev did not know about Najia Badykova's case until then.

37.   Mr. Kurtiev informed Elez Biberaj about receiving the written questions, following general instructions from Mr. Biberaj to keep him informed of activities in the Russian Service.

38.   Mr. Kurtiev did not know that it was improper to discuss matters like this with Mr. Biberaj, in part because he did not know that Mr. Biberaj was named as a discriminating official in Najia Badykova's complaint.

39.   Elez Biberaj asked Mr. Kurtiev how he would respond to certain questions.

40.   Elez Biberaj became visibly upset with Mr. Kurtiev's response to how he would answer questions.

41.   Elez Biberaj told Mr. Kurtiev to go see Sheila Gandji, who was to help him with responses to the questions from the investigator.

42.   Mr. Kurtiev did not know that Sheila Gandji and/or Elez Biberaj had answered some of the questions from the investigator falsely in their own sworn affidavits.

43.   Mr. Kurtiev did not know that Elez Biberaj and Sheila Gandji were concerned that he would contradict their false answers.

44.   Over the next two and to two and one-half months, Elez Biberaj and Sheila Gandji pressured Mr. Kurtiev to make false statements in his  sworn affidavit.

45.    The pressure included both harsh daily rebukes and threats of dismissal.

46.   Mr. Kurtiev was a probationary employee at the time and was afraid of being terminated from his employment.

47.   Elez Biberaj threatened Mr. Kurtiev with dismissal.

48.    Sheila Gandji threatened Mr. Kurtiev by stating that management was not getting what it wanted, that he would hurt the agency by not cooperating with them, and that there would be consequences for this.

49.    The pressure on Mr. Kurtiev was so severe that Mr. Kurtiev collapsed and fell unconscious.

47.    Elez Biberaj told Mr. Kurtiev to approach Ain Minn, with the Human Resources Office, about responses to questions from the investigator.

48.    Elez Biberaj, Sheila Gandji, and Ain Munn were all heavily involved in pressuring Mr. Kurtiev to state certain things in his affidavit and not to state other things.

49.   Sheila Gandji essentially dictated the wording of answers to several questions in the first version of the first set of questions from the investigator.

50.    Sheila Gandji also strongly "suggested" wording of answers to several questions in the second set of questions from the investigator.

51.   Sheila Gandji, along with Elez Biberaj, also demanded other changes, such as to state that Najia Badykova was a very poor performer with conduct issues.

52.   Sheila Gandji and Elez Biberaj also wanted Mr. Kurtiev to exclude some information, such as the fact that Mr. Kurtiev was originally told that the non-renewal of Najia Badykova's contract was necessary due to lack of funds.

53.   Mr. Kurtiev refused to make some statements in his affidavit that he knew, at the time, were false.

54.   This included his refusal to state that Najia Badykova was a very poor performer with conduct issues.

55.   Mr. Kurtiev worked on many drafts of responses to the questions from the investigator over a period of more than two months.

56.   Sheila Gandji, Elez Biberaj, and Ain Munn had multiple changes in various drafts of the affidavit.

57.   Elez Biberaj asked for changes to multiple answers in multiple drafts of the affidavit.

58.   Elez Biberaj also asked to see and approve changes "suggested" by other agency employees.

59.   Ain Munn also made handwritten changes to answers or "suggested" answers to questions in drafts of answers to questions in the affidavit.

60.   Agency counsel and an employee from the contracts office reviewed at least some drafts of the affidavit.

61.    Mr. Kurtiev refused to include information that he considered false in his affidavit.

62.  Mr. Kurtiev refused to include the false allegation that Najia Badykova was a very poor performer with performance issues.

63.    However, Mr. Kurtiev included in his affidavit information that he received from Elez Biberaj and Sheila Gandji that he has since learned was false or misleading.

64.    Later, when Mr. Kurtiev learned that some false or misleading information had been included in his affidavit, he notified agency counsel of that fact, through his own counsel.

65.    Agency counsel failed to pass on the letter from Mr. Kurtiev's counsel to Najia Badykova in a timely manner.

66.  On or about January 16, 2010, Mr. Kurtiev submitted his affidavit answering questions from the investigator in the Najia Badykova case.

67.    On or about February 1, 2010, Sheila Gandji was reassigned and was no longer in charge of financial matters at the Russian Service.

68.  In or about February 2010, Mr. Kurtiev was granted access to financial information concerning the Russian Service.

69.  In or about late February 2010 and/or early March 2010, Mr. Kurtiev found evidence strongly suggesting that the stated grounds for the non-renewal of Najia Badykova's contract, namely "budgetary constraints," were false.

70. Mr. Kurtiev discovered that the Russian Service had extra funds in the budget for contractors for Fiscal Year 2010 and would

likely have a hard time spending all of those funds by the end of the Fiscal Year.

71. It was clear that there were no "budgetary constraints" associated with the non-renewal of Najia Badykova's contract.

72. In or about late February and/or early March 2010, Mr. Kurtiev confronted Elez Biberaj and told Mr. Biberaj bout discovering that the purported reason for the non-renewal of Najia Badykova's contract (i.e., no budgetary constraints) was false.

73. Elez Biberaj threatened to terminate Mr. Kurtiev's employment.

74. Several days later, the first steps to terminate Mr. Kurtiev's employment were taken.

75. In or about late February 2010 and/or early March 2010, Mr. Kurtiev's management took advantage of the racist animosity toward him in the Russian Service, as well as a shift-pick procedure that upset some, to instigate an open conflict between members of the Russian Service and Mr. Kurtiev to create a pretext for his termination.

76. In late February 2010, Mr. Kurtiev, as directed by Elez Biberaj, initiated a shift pick procedure at the Russian Service.

77. The procedure was strictly regulated by an agreement with the union.

78. As a result of the shift-pick process, two members of the Russian Service, Yuliya Appel and Anna Terterian, received evening shifts.

79.   Ms. Appel and Ms. Terterian vehemently protested the evening shifts.

80.   Although Mr. Kurtiev had little control of the shift-pick process, both Ms. Appel and Ms. Terterian strongly blamed him.

81.   Elez Biberaj and John Lennon, Mr. Kurtiev's first and second line supervisors, told Ms. Appel and Ms. Terterian that Mr. Kurtiev was responsible for their receiving bad shifts, that Mr. Kurtiev could change their shifts, and that they should challenge him.

82.   Elez Biberaj and John Lennon provided false information to Ms. Appel and Ms. Terterian, since there was little that Mr. Kurtiev could do in view of the agreement with the union.

83.   On or about March 10, 2010, Ms. Appel and Ms. Terterian visited Mr. Kurtiev in his office to talk about their shifts.

84.   Mr. Kurtiev explained the shift-pick process to them and told them that he could not change their shifts.

85.   Ms. Appel and Ms. Terterian threatened Mr. Kurtiev with trouble because he would not change their shifts.

86.   While the stories changed over time, there was an allegation that Mr. Kurtiev had used a phrase in Russian which was inappropriate during the meeting.

87.   Mr. Kurtiev did not use the Russian phrase during the meeting and did not use the phrase in his speech in other contexts.

88.   One of the meeting participants, who falsely claimed that Mr. Kurtiev used the phrase, did use the phrase regularly herself.

89. Ain Munn, who had actively participated, along with Elez Biberaj and Sheila Gandji, in pressuring Mr. Kurtiev to change his affidavit and/or to include false information in his affidavit, was tasked to lead an investigation into the purported incident.

90. The purported investigation was a sham, designed to provide a pretext to terminate Mr. Kurtiev's employment.

91. Ain Munn never requested that the two purported witnesses to the inappropriate language provide the text of the purported inappropriate language to her.

92. Instead, Ain Munn requested and received the purported text of the Russian phrase from Karine Roushanian, who was not a witness to the alleged incident, but who had participated in the decision to terminate Ms. Badykova's employment, and who was an aide to Elez Biberaj.

93. The wording of the Russian phrase that Karine Roushanian provided did not match the phrase, in English, that the two accusers mentioned in their statements.

94. The Russian phrase was wrongly translated to make it sound far worse than it was.

95. Ain Munn claimed that she had interviewed both of the accusers.

96. However, the report of investigation, prepared by Ain Munn, does not contain any interview summary of one of the accusers, Yuliya Appel.

97.  Sign-in/sign-out sheets from the Russian Service indicate that Yuliya Appel was not at work on the day that Ain Munn claims to have interviewed her.

98.  From on or about March 11, 2010 to on or about March 18, 2010, Ain Munn helped initiate and then led an investigation into Mr. Kurtiev's alleged misconduct.

99.  Ain Munn had been involved, along with Elez Biberaj and Sheila Gandji, in pressuring Mr. Kurtiev to make changes in his affidavit in the Najia Badykova case.

100.  Ain Munn conducted a blatantly biased investigation, designed to provide a basis to terminate Mr. Kurtiev's employment.

101.  Ain Munn interviewed approximately 21 members of the Russian Service about Mr. Kurtiev.

102.  The scope of the investigation was far beyond the allegation that Mr. Kurtiev had used an inappropriate Russian phrase in one meeting.

103.  Some members of the Russian Service stated that Mr. Kurtiev never made inappropriate statements in the office.

104.  Some who stated that Mr. Kurtiev made inappropriate statements in the office also indicated clear discriminatory animus toward Mr. Kurtiev.  Their own statements contained strong evidence of discriminatory animus toward Mr. Kurtiev.  This is shown by Ain Munn's own summaries of their interviews.

105.  For example, Ain Munn's summary of the interview with Mark Belenky states that: "When asked about his management style, Mr. Belenky stated he believes Mr. Kurtiev is out of place in his

14

current position.  He stated Mr. Kurtiev has not (sic) managerial skills and it was a mistake to have hired him.  He further stated Mr. Kurtiev has no knowledge of the Russian language since he is not from Russia but rather Central Asia.  Mr. Belenky then noted, this is the first time in 60+ years that the Division Director cannot read or speak Russian or Ukrainian."

106.  As another example, Ain Munn's summary of the interview with Alexei Pimenov states that: "Mr. Pimenov has not heard him make disparaging statements toward women, but rather his whole approach offends people.  Mr. Kurtiev often uses phrases and profanity . . . that undereducated Russian people would use in informal settings.  Mr. Pimenov attributes this to Mr. Kurtiev's level of education and degree of culture."

107.  As another example, Ain Munn's summary of the interview with Sergei Moskalev states that: "Mr. Moskalev finds Mr. Kurtiev to be impolite.  He believes Mr. Kurtiev's style of aggression is cultural; it is not part of the Western Russian culture."

108.  As another example, Ain Munn's summary of the interview with Sophia Halstead states that: "Ms. Halstead then explained she is unsure of who made the decision to hire Mr. Kurtiev; however, he has no knowledge of Russian history, culture or art."

109.  It went on to state: "In conclusion, Ms. Halstead stated Mr. Kurtiev was not suitable for the position of Service chief and he is not an intelligent person."

110.  As another example, Ain Munn's summary of the interview with Inna Dubinsky states that: "Ms. Dubinsky then stated since Mr.

15

Kurtiev is not fluent in Russian it is unreasonable for him to make an authoritative decision on how something should be done without consultation."

111.   Many of the employees interviewed had highly complimentary comments about Mr. Kurtiev and stated that Mr. Kurtiev had never made any inappropriate remarks.

112.   However, the agency disregarded those comments, since its clear intent was to create a pretext for the termination of Mr. Kurtiev's employment.

113.   Some of the employees interviewed questioned the motivation of the employees who had complained about Mr. Kurtiev.

114.   However, the agency disregarded those comments, since its clear intent was to create a pretext for the termination of Mr. Kurtiev's employment.

115.   Some of the employees interviewed questioned the translation of the Russian phrase in question.

116.   However, the agency disregarded those comments, since its clear intent was to create a pretext for the termination of Mr. Kurtiev's employment.

117.   Mr. Kurtiev provided written comments on the proposed termination of his employment and provided verbal comments in a meeting with John Lennon and Ain Munn.   In the comments, Mr. Kurtiev, including through counsel, stated that many Russians in the Russian Service were motivated by racism to make negative statements about him.

118.   As part of the written comments on the proposed termination, Mr. Kurtiev, through counsel, submitted an affidavit from an attorney from the former Soviet Union who was fluent in Russian.

119.  The attorney has translated documents from Russian to English as part of her normal job duties at major law firms.

120.   The attorney concluded that the agency's purported translation of the phrase in question was incorrect.

121.   The attorney stated in her affidavit: "The Russian words in question are a common sarcastic idiomatic expression used in informal Russian that means 'you will have trouble' or 'you will have problems.'  In the employee/employer context, the expression could mean that someone has no rights and can be subject to unreasonable demands."

122.   The attorney's translation of the phrase was consistent with the translation of one or more members of the Russian Service.

123.  The agency never consulted a professional translator or anyone else with expertise concerning translating Russian to English, even after receiving the affidavit from an attorney who has translated documents from Russian to English for major law firms.

124.  Instead, it made a purported "credibility determination" and determined that it would rely on the translations of a few members of the Russian Service, over the translations of other members of the Russian Service and over the translation of an

attorney who had translated Russian documents to English as part of her job duties at major law firms.

125.   The members of the Russian Service who were consulted about translation of the Russian phrase to English did not translate documents from Russian to English as part of their job duties.

126.   Many of them had poor command of English and did not work in English as part of their job duties.

127.  Many of them were clearly biased concerning Mr. Kurtiev, including because of strong discriminatory animus, that should have been obvious to anyone reading the interview summaries.

128.   The termination of Mr. Kurtiev's employment had no basis and was in retaliation for his protected anti-discrimination activity of refusing to lie in an affidavit for Najia Badykova's discrimination case and for questioning the purported reason for the refusal to renew Ms. Badykova's contract, once he had access to relevant budgetary information.

129.   Discrimination on the basis of national origin and religion also played a role, including because management relied upon the information provided by members of the Russian Service who clearly displayed discriminatory animus.

130.   Mr. Kurtiev performed very well in his job while the head of the Russian Service.

131.   Agency management agreed that Mr. Kurtiev had performed well in his job as head of the Russian Service.

132.  Elez Biberaj told the EEO counselor for Mr. Kurtiev's case that "Mr. Kurtiev was an excellent Managing Editor" and "emphatically stated that Mr. Kurtiev's dismissal was not due to performance."

133.  John Lennon made similar statements to the EEO counselor and "praised [Mr. Kurtiev] for the impressive work he had done in the Russian Service and described Mr. Kurtiev as very astute, accomplished and professional."

134.  Elez Biberaj also stated that "Mr. Kurtiev played an integral role in this transition [of the Russian Service] and has provided the Agency with several new and innovative ideas that have contributed to the success of the Russian Service's new initiative."

135.  Ain Munn stated that "Dr. Biberaj as well as other senior-level managers often spoke highly of Mr. Kurtiev and his performance.  Dr. Biberaj was very impressed with the work Mr. Kurtiev contributed to the Russian Service."

136.  On or about April 19, 2010, Mr. Kurtiev's employment was terminated, effective April 24, 2010.

137.  On or about April 21, 2010, Mr. Kurtiev contacted the agency's Office of Civil Rights to initiate the official EEO process, in a timely manner.

138.  At the time of Mr. Kurtiev's termination, he had in his office many documents that would support his claim that he was pressured to lie in connection with his affidavit in Najia Badykova's discrimination case.  This included hard copies of

19

drafts of his affidavit, including handwritten changes by Elez Biberaj and/or Sheila Gandji and/or Ain Munn.  It also included copies of drafts of his affidavit on the computer in his office in a special directory.

139.  Those documents were destroyed by the Voice of America, after Mr. Kurtiev filed his complaint of discrimination and retaliation and the agency had an obligation to preserve documents.

140.  On or about May 14, 2010, Sheila Gandji sent an email to the information technology department at the Voice of America requesting access to Mr. Kurtiev's work computer.

141.  Sheila Gandji was granted access to Mr. Kurtiev's work computer.

142.  After Sheila Gandji was granted access to Mr. Kurtiev's work computer, the hard drive of that computer was wiped clean by the information technology department at the Voice of America.

143.  The hard copies of drafts of Mr. Kurtiev's affidavit in the Najia Badykova case and comments on those drafts were also destroyed.

144.  In or about May 2010, Mr. Kurtiev learned from his EEO counselor, who coincidentally had also been the EEO counselor in the Najia Badykova case, that Elez Biberaj and Sheila Gandji were the alleged discriminating officials in Ms. Badykova's case.

145.  Mr. Kurtiev also learned other details about Najia Badykova's case that he had not known before.

146.  These facts enabled Mr. Kurtiev to understand the events surrounding his termination and the termination of Najia Badykova

much better and to conclude that both he and Ms. Badykova were clearly fired in retaliation for protected anti-discrimination activity.

147.   On or about June 7, 2010, Mr. Kurtiev filed a timely Formal Complaint as part of the EEO process.

148.   On or about July 19, 2010, Mr. Kurtiev, through counsel, wrote a letter to agency counsel about the facts relating to Najia Badykova's case, including how Mr. Kurtiev was told false information and therefore included false information in his affidavit.

149.   Agency counsel did not request additional information from Mr. Kurtiev or his counsel at the time, although the letter from counsel offered to provide additional information.   Agency counsel also failed to pass the letter on to Najia Badykova in a timely manner.

150.   During the investigation of Mr. Kurtiev's discrimination and retaliation complaint during the EEO process, Ain Munn, who had coordinated answers from responding officials in the Najia Badykova case, insisted on being present during interviews by the investigator of Elez Biberaj and John Lennon, even though she was a witness herself, was accused of wrongdoing by Mr. Kurtiev, and was interviewed herself by the investigator.

151.   There was no legitimate reason for Ain Munn to be present at all interviews.

152.   It was clear that Ain Munn's role was inappropriately and unlawfully to coordinate the testimony to make sure that it was consistent.

153.   Elez Biberaj and Ain Munn both testified falsely about their review of Mr. Kurtiev's draft affidavits in the Najia Badykova case.

154.   Elez Biberaj testified that he had only recommended stylistic changes.

155.   Mr. Biberaj is not a native speaker of English.

156.   Mr. Biberaj's testimony is facially unbelievable since an alleged discriminating official would not insist on reviewing and changing a witness affidavit in a case against him simply to make stylistic changes.

157.   Ain Munn testified that she only proofread Mr. Kurtiev's affidavit for spelling and typographical errors.

158.   Ms. Munn's testimony is facially unbelievable.

159.   Mr. Kurtiev, by happenstance, had some draft affidavits with changes requested by agency officials at his residence.

160.   Those documents show that agency officials requested more than stylistic changes or correcting spelling or typographical errors.

161.   There was no legitimate non-discriminatory basis for the termination of Mr. Kurtiev.

162.   Mr. Kurtiev has been unemployed and/or working in low paying positions since his termination and has suffered a significant loss of compensation.

163.    Mr. Kurtiev has suffered a significant loss of reputation, which has made it difficult for him to secure other permanent employment at a level similar to his past employment as head of the Russian Service.   Much negative "information" concerning the termination of his employment appeared on a popular Russian-language news and blogging platform and in a couple of online publications.

164.   Mr. Kurtiev had an extremely good reputation when he began his employment with the Voice of America.

165.   He had the reputation of someone who was a lifelong fighter for noble causes, such as media freedom and human rights.

166.    As a result of the retaliatory and discriminatory actions against him, his reputation has been badly damaged, such that he cannot find suitable employment.   He has to deal with people who have heard about purported "facts" concerning the termination of his employment.

167.    The false accusations against Mr. Kurtiev and the related termination had a catastrophic impact on him, both on personal and professional levels.

168.   Mr. Kurtiev has experienced severe emotional suffering, thinking that his life is over.

169.   Mr. Kurtiev found the unfairness and terror of it to be unbearable.

170.    Mr. Kurtiev suffered great harm emotionally and physically.

171.   Mr. Kurtiev suffered from insomnia, including early awakening and inability to stay asleep.

172.   Mr. Kurtiev has suffered from nightmares, recurring memories of traumatic episodes related to his employment with the Voice of America, strong emotional and physical reactions to anything related to the Voice of America and his experiences there or to anything reminding him of the Voice of America and his experiences there.

173.   Mr. Kurtiev has suffered from constant negative thoughts, change in personality, loss of enjoyment of life, loss of interest and pleasure in things and activities he once enjoyed, withdrawal from family and friends, lack of desire to socialize, detachment and isolation, irritability, persistent anxiety, feelings of hopelessness, worthlessness, and pessimism, easiness to startle and painful reaction when startled, fear, dramatically decreased energy, fatigue, inability to perform basic tasks that used to be easily performed, serious difficulty concentrating, remembering and doings things and making decisions about them, digestive system problems, and other negative emotional and physical symptoms.

174.   Some of the symptoms started when Mr. Kurtiev was working at the Voice of America, during the period when he was being pressured to testify falsely in his affidavit in the Najia Badykova case.

175.   Mr. Kurtiev experienced the symptoms at extreme levels for about a year or so after the termination of his employment.

176.   Mr. Kurtiev still suffers from many of the symptoms, although some may not be as severe as they used to be.

177.   Mr. Kurtiev was not able to see doctors for medical problems, including vision problems, for financial reasons, after the termination of his employment.

178.   Mr. Kurtiev met all filing deadlines and exhausted all administrative remedies with the Voice of America and/or the Broadcasting Board of Governors, and the EEOC.

179.   Mr. Kurtiev, through counsel, received the final decision of the EEOC on or about August 5, 2015.

180.   The EEOC's decision provides, that for timeliness purposes, it is considered to be received on August 5, 2015.

V. <u>CLAIMS FOR RELIEF</u>

COUNT ONE
<u>RETALIATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT</u>

181. The allegations of the preceding paragraphs are here realleged.

182. Mr. Kurtiev was retaliated against in violation of Title VII of the Civil Rights Act of 1964 when the Voice of America and/or the Broadcasting Board of Governors took unjustified retaliatory actions against him, including terminating his employment, effective on or about April 24, 2010.

183. Mr. Kurtiev reported all of the above incidents of retaliation to an EEO counselor and properly exhausted his administrative remedies on all of the incidents.

184. Mr. Kurtiev met all reasonable expectations of his employer and performed his job well.

25

185. The actions taken against Mr. Kurtiev, including his termination, were all unjustified and were willful or intentional.

186. The retaliation and disparate treatment interfered with Mr. Kurtiev's work performance, was humiliating, was unwelcome, and materially altered the terms and conditions of his employment.

187. The retaliation and disparate treatment described above caused Mr. Kurtiev to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, harm to his professional reputation, and loss of enjoyment of life.

COUNT TWO
DISCRIMINATION ON BASIS OF NATIONAL ORIGIN AND/OR RELIGION

188. The allegations of the preceding paragraphs are here realleged.

189. Mr. Kurtiev was discriminated against on the basis of national origin and/or religion in violation of the Civil Rights Act of 1964 when the Voice of America and/or the Broadcasting Board of Governors took unjustified discriminatory actions against him, including terminating his employment, effective on or about April 24, 2010.

190. Mr. Kurtiev timely reported all of the above incidents of discrimination and/or retaliation to an EEO counselor and properly exhausted his administrative remedies on all of the incidents.

191.  Mr. Kurtiev met all reasonable expectations of his employer and performed his job well.

192. The actions taken against Mr. Kurtiev were all unjustified and were willful or intentional.

193. The discrimination and/or retaliation and disparate treatment interfered with Mr. Kurtiev's work performance, was humiliating, was unwelcome, and materially altered the terms and conditions of his employment.

194. The discrimination and/or retaliation and disparate treatment described above caused Mr. Kurtiev to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, harm to his professional reputation, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, for the discrimination and/or retaliation against him, Mr. Kurtiev demands judgment against Defendants Jeff Shell and the Broadcasting Board of Governors, for all damages allowed by law and to be determined at trial, including reinstatement to his former position and/or a similar position, with all back pay and benefits, all lost wages and other compensation and benefits; compensatory damages for the physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life; pre-judgment and post-judgment interest; reasonable attorney's fees, costs, and expenses; an Order declaring that Defendant has violated Mr. Kurtiev's rights under Title VII of the Civil Rights Act of 1964 and enjoining further discrimination and/or retaliation against him; and such other relief as this Court considers proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

AYDER KURTIEV
By counsel:

_____   /s/ John J. Rigby
John J. Rigby
D.C. Bar #255539
McInroy & Rigby, L.L.P.
2200 Clarendon Blvd., Suite 1201
Arlington, Virginia 22201
(703) 841-1100
(703) 841-1161 (fax)
jrigby@mcinroyrigby.com

_____   /s/ Jeffrey L. Rhodes
Jeffrey L. Rhodes
D.C. Bar #472468
Albo & Oblon, L.L.P.
2200 Clarendon Blvd., Suite 1201
Arlington, Virginia 22201
(703) 312-0410
(703) 312-0415 (fax)
jlr@albo-oblon.com