**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AYDER KURTIEV,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>JEFFREY SHELL, *et al.,*<br><br>　　　　　　Defendants. | No. 15-cv-1839 (EGS) |

<u>**MEMORANDUM OPINION**</u>

## I.  Introduction

Plaintiff Ayder Kurtiev ("Mr. Kurtiev") brings this action against the Defendant Jeff Shell, the Chair of the Broadcasting Board of Governors ("BBG"), and Defendant BBG, which oversee the component broadcaster, the Voice of America ("VOA") (collectively "Defendants" or "VOA") alleging discrimination on the basis of national origin and/or religion, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq*. Pending before the Court is Defendants' Motion for Summary Judgment. *See* Defs.' Mot., ECF No. 32. The Court has carefully considered the motion, the response and reply thereto, the applicable law, and the entire record herein. The Court **GRANTS** Defendants' Motion for Summary Judgment.

## II.  Background

### A. Factual Background

Except where indicated, the following facts are not in dispute. Mr. Kurtiev, who identifies as Muslim, with a Crimean Tatar ethnic background, is a naturalized United States citizen originally from Uzbekistan, part of the former Soviet Union. Compl., ECF No. 1 at 3 ¶ 8.[1] His native language is Russian, and he was educated in Russian language schools in Uzbekistan. *Id*. The VOA hired Mr. Kurtiev on June 21, 2009, to be the Managing Editor of its Russian Service. Defs.' Mot., ECF No. 32-1 at 7. Throughout his entire employment with the VOA, Mr. Kurtiev was a probationary employee, which meant he could be "terminated at any time during [the two-year trial period] because of deficiency in performance, unsatisfactory conduct, unsuitability, or changes in VOA programming or staffing needs." Defs.' Ex. Z, ECF No. 32-28 at 2. During Mr. Kurtiev's tenure at the VOA, Dr. Elez Biberaj, Director of the Eurasian Division, was his "first-line supervisor." Pl.'s Ex. 4, ECF No. 36-3 at 6:20-21; Pl.'s Ex. 6, ECF No. 36-4 at 23:3-5.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document with the exception of deposition testimony, which is to the page number of the deposition transcript.

### 1. Mr. Kurtiev's Witness Affidavit in the Investigation of Najia Badykova's Equal Employment Opportunity Complaint

On September 4, 2009, Ms. Badykova, a VOA Russian Service contractor, was informed that her contract would not be renewed. Defs.' Ex. A, ECF No. 32-3 at 3, 4. Mr. Kurtiev was responsible for "review[ing] Ms. Badykova's work product for acceptance under the terms of the contract." *Id.* at 3. At the time this decision was made, Ms. Badykova had a pending Equal Employment Opportunity ("EEO") claim alleging that she had been discriminated against based on her religion when she was not selected for a position within the VOA. Defs.' Ex. D, ECF No. 32-6 at 4. The EEO investigation of that claim included investigating the decision not to renew her contract as she later alleged that her contract was not renewed in retaliation for her EEO activity. *See id.* at 11.

In January 2010, Mr. Kurtiev submitted a Witness Affidavit as part of the investigation of Ms. Badykova's EEO Claim. *See* Defs.' Ex. A, ECF No. 32-3 at 4. Prior to the submission of the affidavit, and in response to Mr. Kurtiev's requests, several VOA officials reviewed the document, which was common practice at the VOA. Defs.' Ex. F, ECF No. 32-8 at 27:20-28:2; Defs.' Ex. B, ECF No. 32-4 at 151:3-11. Though he now denies that the decision was his to make, Mr. Kurtiev averred that "I, Ayder Kurtiev, Managing Editor, made the decision not to renew the

Complainant's contract. . . . The Complainant's contract was not renewed due to changing operational requirements in the Russian Service." Defs.' Ex. A, ECF No. 32-3 at 4.

### 2. March 2010 Incident Involving Mr. Kurtiev and Two Subordinate, Female Employees

In the afternoon of March 10, 2010, two Russian Service employees—Anna Terterian and Yulia Appel—came to Mr. Kurtiev's office to discuss changes that had been made to their shifts. Pl.'s Counter Statement of Facts, ECF No. 39 at 6. Following that meeting, Ms. Terterian called another VOA employee, Karine Roushanian, who in an email she sent to Dr. Biberaj the morning of March 11, 2010, stated that Ms. Terterian "was crying so hard that she could hardly talk" and "did not know how to deal with what just happened to her and [Ms. Appel.]" *Id.* (citing Defs.' Ex. N, ECF No. 32-16 at 2); *see also* Defs.' Ex. O, ECF No. 32-17 at 26:10–27:3, 27:22–29:2. In the same email, Ms. Roushanian stated that Ms. Terterian told her that Mr. Kurtiev responded to a question about shift responsibilities by "laugh[ing] in a shameless way," translated his Russian statement into English as "[i]f you do so, the next day when you come they [the Division] will have you in different poses,["] and that he accompanied his statement "with some moves with the chair." Pl.'s Counter Statement of Facts, ECF No. 32 at 6-7 (citing Defs.' Ex. N, ECF No. 32-16 at 2; *see also* Defs.' Ex. O, ECF No. 32-17 at 28:21-

4

29:1-10. Dr. Biberaj forwarded the e-mail to Ain Munn, a Labor and Employee Relations ("LER") Specialist in the VOA's Office of Human Resources, asking to meet at her earliest convenience to discuss the incident. Defs.' Ex. R, ECF No. 32-20 at 2; *see also* ECF No. 32-1 at 8 (explaining Ms. Munn's job responsibilities).

Also in the morning of March 11, 2010, Ms. Terterian described the incident in an email to Ms. Appel and Ms. Appel agreed with her description of the incident. Defs.' Ex. M, ECF No. 32-15 at 2. In that email, Ms. Terterian translated the statement "[a]nd then the next day they will f*** you in as many positions as they can." *Id.* Ms. Terterian then sent the email to Ms. Munn. *See id.* Mr. Kurtiev denies that he made the statement and points out differences in Ms. Terterian's English translation of the statement, specifically that on the day of the incident she translated the phrase to include the word "have" but on the next day, she translated the phrase to include the "f" word. Pl.'s Opp'n, ECF No. 36 at 13.

On the same day, LER staff met with Ms. Roushanian, who reiterated that when Ms. Terterian called her the day before, Ms. Terterian "was extremely upset . . . to the point she could not understand what was being said." Defs.' Ex. S, ECF No. 32-21 at 2. LER staff "then met with Ms. Terterian who was visibly upset when she began discussing the interaction with Mr. Kurtiev. Ms. Terterian also demonstrated how Mr. Kurtiev moved

the chair when he made the  . . . statement." *Id*. Ms. Terterian was placed on administrative leave for the remainder of that day and for the next day. *Id*. Ms. Munn testified that she met with Ms. Appel after meeting with Ms. Terterian and that Ms. Appel said the same thing that Ms. Terterian said about the incident during the meeting with Mr. Kurtiev. Pl.'s Ex. 33, ECF No. 36-14 at 51:14-16. Mr. Kurtiev disputes that Ms. Munn met with Ms. Terterian in person because her notes of the meeting include Ms. Terterian's telephone number and that Ms. Munn met with Ms. Appel because no notes of the meeting with Ms. Appel have been produced despite Ms. Munn's statement in her deposition that she "takes notes for every meeting." *Id*. at 54:16-55:7; 53:4; *see also* ECF No. 40 at 31. LER staff then met with Mr. Kurtiev, who "adamantly denied making any offensive statements to Ms. Appel and Ms. Terterian." Defs.' Ex. S, ECF No. 32-21 at 2. LER staff determined that "a full inquiry needed to be conducted and Mr. Kurtiev was placed on administrative leave pending the outcome of the investigation." *Id*.

LER staff investigated the incident by interviewing sixteen Russian Service employees, asking each individual the same twenty-two questions, and then drafting summaries of the interviews. Defs.' Ex. L, ECF No. 32-13 at 61:8-13. Mr. Kurtiev does not dispute that the VOA conducted interviews with most of the Russian Service employees, nor the results of those

interviews, but he disputes that the phrase was translated
properly by the Russian Service employees, and his expert, an
employment lawyer who conducts investigations into workplace
misconduct, disputes whether VOA's investigation was fair and
reliable. Pl.'s Ex. 10, ECF No. 36-7 at 20.

Seven of the Russian Service employees stated that Mr.
Kurtiev used inappropriate or profane language in the workplace,
including the "f" word. Defs.' Ex. Y, ECF No. 32-27 at 2; *see
also* Defs.' Ex. W, ECF No. 32-25 at 5 (stating that he has heard
Mr. Kurtiev use the "f" word); 10 (stating that Mr. Kurtiev
"use[d] profanity (f***, s***) when he is upset") (profanity
altered); 13 ("Mr. Kurtiev often uses [phrase] and profanity
(f***) that undereducated Russian people would use in informal
settings.") (profanity altered); 21 (stating that Mr. Kurtiev
"often said m*****f*** or similar words often in Russian but not
in English") (profanity altered); 26 (stating that he has heard
Mr. Kurtiev use the "f" word); 30 (stating that she has heard
Mr. Kurtiev use the "f" word but not often); 32 (stating that
she has heard Mr. Kurtiev use the "f" word many times).

Regarding the statement at issue, all of the employees
translated the Russian phrase as having a sexual connotation or
otherwise being inappropriate in a workplace. *See, e.g.*, Defs.'
Ex. W, ECF No. 32-25 at 4 ("He stated that it meant to f*** you
different [sic] positions. The phase is absolutely

unacceptable.") (profanity altered); 6 ("it meant they will f***
you in different positions") (profanity altered); 9 ("They will
have you sexually in many different positions."); 14 ("they will
f*** you in other positions") (profanity altered); 18 ("They
will f*** you in different positions").

Mr. Kurtiev does not dispute that the interviewed employees
made the statements or that some of these employees' job
responsibilities included translating Russian into English, but
he contends that "[t]he members of the Russian Service were not
qualified to do translation because of their poor English. The
Russian Service had to use professional translators because
members of the Russian Service did such a poor job when they
tried to translate." Pl.'s Opp'n, ECF No. 36 at 32 (citing Pl.'s
Ex. 6, ECF No. 36-4 at 86-87, 222-224).

On March 19, 2010, Donna Grace, Director of the Office of
Human Resources, informed Ms. Munn via email that "Dan Austin [,
Director of the Voice of America] has made the decision to
terminate Mr. Kurtiev's employment." Defs.' Ex. X, 32-26 at 2.
This email was sent in response to an undated email from Ms.
Munn in which she stated, "here are the statements our office
has so far for the Russian Service." *Id*. Later that day, Tisha
Elliott, another LER staff member, informed Ms. Munn that Mr.
Kurtiev had called her and stated that he had additional
information that would be helpful to the investigation. Pl.'s

8

Ex. 20, ECF No. 36-11 at 4. In the afternoon of March 22, 2010, Mr. Kurtiev, at his request, met with Ms. Munn to provide the additional information to her. Defs.' Ex. B, ECF No. 32-4 at 220:6-7; Defs.' Ex. U, 32-23 at 13.

In a Notice of Termination of Appointment letter dated March 24, 2010, the VOA informed Mr. Kurtiev that his contract would not be renewed or extended, but would expire on April 24, 2010. Defs.' Ex. Z, ECF No. 32-28 at 2. The letter stated that the VOA "determined that [he had] displayed unacceptable conduct during [his] tenure with VOA," specifically referencing the March 10, 2010 incident with the two subordinate female employees. *Id*. The letter also referenced a memorandum from Dr. Biberaj, which was included with the letter, and which summarized the unacceptable behavior. *Id*. The memorandum from Dr. Biberaj stated that his recommendation to terminate Mr. Kurtiev's employment was based on conduct rather than performance or personality traits. Defs.' Ex. C, ECF No. 32-5 at 2. The memorandum further stated that the conduct for which the recommendation was being made was: (1) the March 10, 2010 incident; and (2) that the investigation of that incident revealed that "Mr. Kurtiev has made several inappropriate remarks throughout his tenure." *Id*. The Notice of Termination of Appointment letter informed Mr. Kurtiev of his "right to request that the VOA reconsider its determination concerning your

fitness for continued employment" and explained the process for doing so. Defs.' Ex. Z, ECF No. 32-28 at 2. Two days later, on March 26, 2010, Mr. Kurtiev responded to the Notice of Termination in a fourteen-page document in which he, among other things, denied that the statement translated as "they will f-- you in different positions or anything close to that," and alleging that the employees who made the complaint were disgruntled against him because of the change to their shifts. Defs.' Mot., ECF No. 32-1 at 12; Defs.' Ex. U, ECF No. 32-23 at 2.

Thereafter, Mr. Kurtiev sent a letter, through counsel, requesting that the VOA reconsider its decision and seeking a meeting with the final decision-maker, John Lennon, Associate Director for Language Programming. Defs.' Ex. AA, ECF No. 32-29 at 2. Pursuant to that request, Mr. Kurtiev, his attorney, Mr. Lennon, and Ms. Munn met on April 8, 2010. Defs.' Ex. CC, ECF No. 32-31. At that meeting, Mr. Kurtiev provided an Affidavit from Ms. Laimute Lipinskaite, who averred that she is fluent in the Russian language, asserted that the phrase had been translated incorrectly, and provided an alternate translation that did not have a sexual connotation. Defs.' Ex. Y, ECF No. 32-27 at 2-3. On April 9, 2010, Mr. Lennon received Mr. Kurtiev's written statement. Defs.' Ex. Y, ECF No. 32-27. And on April 12, 2010, his attorney sent a letter following up to that

meeting. Defs.' Ex. CC, ECF No. 32-31.

In a Decision Notice-Termination of Appointment letter dated April 19, 2010, Mr. Kurtiev was informed that Mr. Lennon had determined to uphold the decision to terminate Mr. Kurtiev's appointment. Defs.' Ex. Y, ECF No. 32-27 at 4. That letter stated that, in addition to the March 10, 2010 incident, the VOA based its decision on reports that Mr. Kurtiev had "repeatedly and frequently made inappropriate statements to several members of the Russian Service." *Id.*

Mr. Kurtiev filed a formal Equal Employment Opportunity ("EEOC") complaint on June 7, 2010, and on August 5, 2015, the EEOC issued a right to file suit notice. Compl., ECF No. 1 at 1.

### B. Procedural History

On October 15, 2015, Mr. Kurtiev timely filed the current action. *See* Compl., ECF No. 1. Defendants filed their Motion for Summary Judgment on May 15, 2019. Defs.' Mot., ECF No. 32. Mr. Kurtiev filed his Opposition Response on August 30, 2019, *see* Pl.'s Opp'n, ECF No. 36, and Defendants filed their Reply on October 2, 2019, Defs.' Reply, ECF No. 37. The motion is ripe and ready for the Court's adjudication.

## III. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the nonmoving party must demonstrate that there is a genuine issue of material fact. *Id.* at 324. A material fact is one that is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, in the summary judgment analysis "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV. Analysis

Under Title VII, it is unlawful for an employer to: (1) "discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of [his] race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1); or (2) retaliate against any

12

individual for participating in a protected activity, 42 U.S.C. § 2000e-3(a).

Discrimination and retaliation claims are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). As the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has instructed:

> A plaintiff must first establish her prima facie case. To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination. *Stella v. Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002). For a retaliation claim, the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct. *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012).
>
> If the plaintiff clears that hurdle, the burden shifts to the employer to identify the legitimate, nondiscriminatory or non-retaliatory reason on which it relied in taking the complained-of action. *Holcomb v. Powell,* 433 F.3d 889, 896 (D.C. Cir. 2006). Assuming the employer proffers such a reason, the "central question" at summary judgment becomes whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or nonretaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Allen v. Johnson,* 795 F.3d 34, 39, No. 13-5170, 2015 WL 4489510, at *3 (D.C. Cir. July 24, 2015)

(brackets omitted) (quoting *Brady,* 520 F.3d at 494); *see also Hamilton,* 666 F.3d at 1351.

A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

The VOA argues that it had legitimate, non-discriminatory reasons for terminating Mr. Kurtiev's probationary employment, and that Mr. Kurtiev cannot demonstrate that the reasons were pretextual. *See* Defs.' Mot., ECF No. 31-1 at 19. In response, Mr. Kurtiev argues that there "are many disputed issues of material fact," concerning his "Title VII retaliation claim and the related discrimination claim," such that the VOA is not entitled to summary judgment. Pl.'s Opp'n, ECF No. 36 at 1. The VOA replies that it is entitled to summary judgment because each of Mr. Kurtiev's theories rely "on untenable leaps in logic and fail[] to cast doubt on the clear basis for terminating [Mr.] Kurtiev—his misconduct with two female subordinates." Defs.' Reply, ECF No. 37 at 4.

**A. Mr. Kurtiev Has Failed to Produce Sufficient Evidence From Which a Reasonable Jury Could Find that the VOA's Stated Reason for Terminating Him Was Pretext for Discrimination Based on National Origin and/or Religion**

Mr. Kurtiev alleges that he was discriminated against based on his national origin and/or religion when his employment was terminated. Compl., ECF No. 1 at 26 ¶ 189. To demonstrate that it had a legitimate, non-discriminatory reason for its actions, the VOA asserts that it terminated Mr. Kurtiev after it: (1) "received a report from two female employees stating that [Mr. Kurtiev] responded to a work-related question with vulgar language and gestures," Defs.' Mot., ECF No. 32-1 at 19; (2) found the allegations credible after investigating the claim, *see id.*; and (3) during the investigation learned that many of Mr. Kurtiev's subordinates reported that he "frequently used inappropriate and vulgar language in the workplace." *Id.*

To support its legitimate, non-discriminatory reason for terminating Mr. Kurtiev's employment, the VOA provided evidence that: (1) on March 11, 2010, two female, subordinate employees notified LER staff by email that Mr. Kurtiev had stated to them in Russian, "then the next day they will f*** you in as many positions as they can." Defs.' Ex. M, ECF No. 32-15 at 2; (2) LER staff met with Mr. Kurtiev to discuss the incident, *see* Defs.' Ex. B, ECF No. 32-4 at 176:8-178:21; and (3) LER staff interviewed sixteen Russian Service employees who worked with

Mr. Kurtiev, all of whom translated Mr. Kurtiev's statement as having a sexual connotation, and many of whom stated that Mr. Kurtiev used inappropriate or vulgar language in the workplace. Defs.' Ex. W, ECF No. 32-25.

Courts have found that the use of inappropriate language in the workplace can constitute a legitimate, non-discriminatory reason for an adverse employment action. *See Thompson v. Sessions*, 278 F. Supp. 3d 227, 243 (D.D.C. 2017) (rejecting comparator evidence as support for pretext when an employee was reprimanded for using profanity when speaking to other employees during angry tirades even though a younger employee of a different gender was not reprimanded for using profanity); *Stewart v. Fed. Commc'ns Comm'n*, 279 F. Supp. 3d 209, 221 (D.D.C. 2017) (noting that the employer's refusal to award an annual bonus due to the employee's use of profanity was legitimate and non-retaliatory).

Since the VOA has "asserted a legitimate, non-discriminatory reason for" terminating Mr. Kurtiev, the Court need not examine whether Mr. Kurtiev made out a prima facie case of national origin and/or religious discrimination as it is "no longer relevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). At this point, under the *McDonnell Douglas* framework, the burden has shifted back to Mr. Kurtiev to demonstrate that the VOA's "stated reasons were pretextual, and

16

the real reasons were prohibited discrimination or retaliation." *Walker*, 798 F.3d at 1092. And "the central question at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or nonretaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee. *Id*. at 1092 (internal quotation marks and citation omitted).

### 1. Insufficient Evidence of Pretext Based on Mr. Kurtiev's Testimony that He Did not Make the Statement[2]

The Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks and citation omitted). "Once the employer has articulated a non-discriminatory explanation for its action, as did the [employer] here, the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes the reasons it offers." *Id*. An inference of pretext could be appropriate where "the employer made an error too obvious to be unintentional" because in such a situation, "perhaps [the employer] had an unlawful motive for doing so." *Id*.

---

[2] This analysis is equally applicable to Mr. Kurtiev's argument that he was terminated in retaliation for engaging in protected activity.

Mr. Kurtiev, citing his deposition testimony, denies that he made the statement during the meeting with Ms. Appel and Ms. Terterian. Pl.'s Opp'n, ECF No. 36 at 3. LER staff was informed of the incident the day after it occurred and began investigating it that day. LER staff interviewed Ms. Terterian and Ms. Appel in person and separately. Each described the incident consistently. LER staff then interviewed Mr. Kurtiev, who denied making the statement. Over the next week, LER staff interviewed sixteen members of the Russian Service, seven of whom stated that Mr. Kurtiev used inappropriate and/or profane words in the work place. Finally, Ms. Munn made credibility determinations based on her "discussions with Ms. Appel and Ms. Terterian, Ms. Terterian's emotional state, [and] the translation of the statement that each member of the Russian Service translated to being the same." Defs.' Ex. K, ECF No. 32-13 at 73:11-16.

The VOA concluded that although Mr. Kurtiev denied making the statement, "the charge [of having made the statement] was supported by a preponderance of the evidence, i.e., accounts from two employees, both of whom were in the room when the comment was made." Defs.' Ex. Y, ECF No. 32-27 at 2. Mr. Kurtiev's denial of having made the statement does not call into question whether the VOA "honestly believe[d] the reasons it offers," nor does his denial suggest "the employer made an

error too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183. Moreover, his own self-serving assertions do not give rise to a triable issue of fact. *Toomer v. Mattis*, 266 F. Supp. 2d 184, 200 (D.D.C. 2017) (Sullivan, J.).

For all of these reasons, Mr. Kurtiev's denial of having made the statement does not provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

### 2. Insufficient Evidence of Pretext Based on the Translation of the Phrase[3]

Mr. Kurtiev argues that the VOA relied on an inaccurate translation of the phrase in making its decision, pointing out that he provided VOA management with alternate translations of the phrase by a "fluent Russian speaker" and a "native Russian speaker," neither of which had a sexual connotation. Pl.'s Opp'n, ECF No. 36 at 2, 3, 22-23. All sixteen Russian Service employees who were asked to translate the phrase translated it as having a sexual connotation. *See* Defs.' Ex. W, ECF No. 32-35. The VOA found the translation of the phrase as having a sexual connotation to be more credible, stating that "there is no

---

[3] This analysis is equally applicable to Mr. Kurtiev's argument that he was terminated in retaliation for engaging in protected activity.

reason for Russian Service employees, some of whom expressed support for your leadership, to misrepresent the meaning of the phrase." Defs.' Ex. Y, ECF No. 32-27 at 3. The VOA also noted it obtained a generic translation of the phrase using Google which also had a sexual connotation. *Id*. Finally, the VOA dismissed Mr. Kurtiev's alternate translations of the phrase: the "poor judgment [Mr. Kurtiev] displayed . . . by attempting to provide a false translation to mitigate [his] misconduct lead me to conclude that [his] removal from federal service is justified and necessary." Defs.' Ex. Y, ECF No. 32-27 at 3-4.

Although Mr. Kurtiev attempts to cast doubt on the ability of Russian Service employees to accurately translate the phrase into English, he testified that for some of those who provided the translation, performing translations was part of their day-to-day jobs. Defs.' Ex. B, ECF No. 32-4 at 222:7-225:6. Based on this evidence, it is clear that VOA management "honestly believe[d] the reasons it offer[ed]" and these facts do not suggest "the employer made an error too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183. And Mr. Kurtiev's alternate translations without a sexual connotation balanced against the unanimous translations with a sexual connotation does not create a genuine issue for trial because "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

trial." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

For all of these reasons, Mr. Kurtiev has failed to provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

### 3. Insufficient Evidence of Pretext Based on Certain Russian Service Employees' Alleged Racial Animus Towards Non-Russians

Mr. Kurtiev argues that a reasonable jury could infer a discriminatory basis for his termination because some Russian Service employees used racial slurs in the workplace, Pl.'s Opp'n, ECF No. 36 at 2, 19; and because the decision to terminate him relied on the summaries of the interviews with Russian Service employees, some of whom showed discriminatory animus during their interviews, *id.* at 14-16. To support his argument that some Russian Service employees used racial slurs in the workplace, Mr. Kurtiev cites his own interrogatory answers, Pl.'s Ex. 5, ECF No. 36-3 at 27-28; his own affidavit, Pl.'s Ex. 1, ECF No. 36-1 ¶ 2; and Ms. Munn's notes of the April 8, 2010 meeting between Mr. Kurtiev, his attorney, Mr. Lennon and herself, where Mr. Kurtiev made the same allegation, Pl.'s Ex. 27, ECF No. 36-12 at 7-8. Mr. Kurtiev also points to the

21

summaries of the interviews with six of the Russian Service
employees. *Id.* at 15-16 (citing Defs.' Ex. W, ECF No. 32-25 at 5
("Mr. Kurtiev is out of place in his current position . . .
[and] has no knowledge of the Russian language since he is not
from Russia but rather Central Asia."); 13 (attributing Mr.
Kurtiev's profanity to his "level of education and degree of
culture"); 27 ("Mr. Kurtiev's style of aggression is cultural;
it is not part of the Western Russian culture."); 30 (Mr.
Kurtiev "has no knowledge of Russian history, culture or art");
32 ("[S]ince Mr. Kurtiev is not fluent in Russian it is
unreasonable for him to make an authoritative decision on how
something should be done without consultation."); 21 ("Mr.
Kurtiev is from Middle Asia where women are considered low
compared to men which may be the reason Mr. Kurtiev behaves the
[sic] way.").

As an initial matter, Mr. Kurtiev is unable to point to any
evidence other than his own statements to support his allegation
that some Russian Service employees used racial slurs in the
workplace. But his own self-serving assertions do not give rise
to a triable issue of fact. *Toomer*, 266 F. Supp. 2d at 200. And
whether or not the statements suggest racial animus on the part
of the individuals who made them, Mr. Kurtiev has provided no
evidence that the VOA staff who were involved in and made the
decision to terminate him held similar opinions. That in making

its decision, the VOA relied in part on the summaries does not call into question whether the VOA "honestly believe[d] the reasons it offers," nor does the reliance on those summaries suggest "the employer made an error too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183.

For all of these reasons, Mr. Kurtiev has failed to provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

### 4. Insufficient Evidence of Pretext Based on Mr. Kurtiev's Miscellaneous Arguments[4]

Finally, Mr. Kurtiev raises a number of miscellaneous arguments as to why the Court should conclude that a reasonable jury could infer a discriminatory purpose in his termination. Mr. Kurtiev states that "[Ms.] Appel admitted that she used the phrase herself." Pl.'s Opp'n, ECF No. 36 at 21. However, Ms. Appel is not similarly situated to Mr. Kurtiev because, among other reasons, she was his subordinate. Consequently, this argument fails. *Walker*, 798 F.3d at 1092 (discriminatory purpose could be demonstrated by "citing the [VOA's] better treatment of similarly situated employees outside [his] protected group").

---

[4] This analysis is equally applicable to Mr. Kurtiev's argument that he was terminated in retaliation for engaging in protected activity.

Mr. Kurtiev argues that Ms. Appel's, Ms. Terterian's, and others' translations of the phrase were inconsistent because it was sometimes translated as including the "f" word, sometimes as "screw," and sometimes as "have." Pl.'s Opp'n, ECF No. 36 at 20-22. He also contends that "Ms. Terterian decided to make the words more sinister" when the day after the incident, she stated that the phrase included the "f" word whereas the day of the incident her translation of the phrase did not include the "f" word. *Id.* at 22. Although the record contains slight deviations in the translation of the phrase, those deviations do not change the sexual connotation of the phrase. Accordingly, these slight deviations do not create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

Mr. Kurtiev argues that the decision-making process was unusual. Pl.'s Opp'n, ECF No. 36 at 24. He argues that Mr. Austin decided to terminate his employment on March 19, 2010, but that "[t]he agency then fabricated a record purportedly showing that [Dr.] Biberaj decided to terminate Mr. Kurtiev's employment and that [Mr.] Lennon upheld that decision." *Id.*

The evidence shows that on March 19, 2010, Ms. Grace informed Ms. Munn via email that "Dan Austin has made the decision to terminate Mr. Kurtiev's employment," Defs.' Ex. X,

24

ECF No. 32-26; and that in a memo dated March 23, 2010, Dr. Biberaj recommended Mr. Kurtiev's termination to Mr. Lennon, and that recommendation was agreed to by Mr. Lennon, Steve Redisch, VOA Executive Editor, and Ms. Grace. Defs.' Ex. C, 2-3. Mr. Lennon testified that he was the "nominal deciding official" but that Mr. Austin "became aware of the results of the investigation and made a preliminary decision to dismiss Mr. Kurtiev . . . [that] his employment should be terminated." Pl.'s Ex. 32, ECF No. 36-13 at 31:3-4, 9-11, 19-20.

However, that Dr. Biberaj, Mr. Kurtiev's immediate supervisor, wrote a memorandum dated March 23, 2010 recommending that Mr. Kurtiev's employment be terminated, and that Mr. Austin, the Director of the VOA, decided on March 19, 2010 that Mr. Kurtiev's employment should be terminated after learning the results of the investigation does create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext for discrimination as Mr. Kurtiev has introduced no evidence linking this timeline to any discriminatory intent. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. Mr. Kurtiev also argues that Ms. Munn admitted that if Mr. Austin made the termination decision rather than Mr. Lennon, this would have been against VOA policy. Pl.'s Opp'n, ECF No. 36 at 24. However, this misstates Ms. Munn's testimony. Ms. Munn stated that if the "Decision Notice"—

here the April 19, 2010 letter—had been issued before the "Notice"—here the March 24, 2010 letter—in which the employee is notified of the opportunity to seek reconsideration of the "Notice," this would have been against VOA policy. Pl.'s Ex. 33, ECF No. 36-24 at 77:15-20.

Finally, Mr. Kurtiev argues that "there are many inconsistencies concerning the official reason for [his] Kurtiev's termination," Pl.'s Opp'n, ECF No. 36 at 24-25. First, Mr. Kurtiev argues that Ms. Munn testified that Mr. Kurtiev was terminated based only on the one phrase he was accused of using, whereas the Decision Notice states that he was also being terminated for "repeatedly and frequently ma[king] inappropriate statements to several members of the Russian Service." *Id.* at 24. That Ms. Munn did not recall the additional stated reason for Mr. Kurtiev's termination in a deposition taken seven years after the decision does not create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. Second, Mr. Kurtiev argues that Mr. Lennon stated for the first time in his deposition that his decision was based on part on Mr. Kurtiev's managerial performance. Pl.'s Opp'n, ECF No. 36 at 25. Mr. Lennon testified that "part of my decision had to be based on an assessment of his supervisor and managerial skills as evidenced by his

performance." Pl.'s Ex. 32, ECF No. 36-13 at 30:22-31:1-2. Again, that Mr. Lennon did not recall that Mr. Kurtiev was terminated based on conduct rather than performance in a deposition taken seven years after the decision does not create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. Furthermore, Mr. Lennon later confirmed in the deposition that Mr. Kurtiev's employment was terminated based on the investigation into the March 2010 incident. Pl.'s Ex. 32, ECF No. 36-13 at 70:7-13.

For all of these reasons, Mr. Kurtiev has failed to present evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

Accordingly, since Mr. Kurtiev failed to present evidence from which a reasonable jury could find that he was terminated due to his national origin and/or religion, the Defendants' Motion for Summary Judgment on this claim is **GRANTED**.

**B. Mr. Kurtiev Has Failed to Produce Sufficient Evidence From Which a Reasonable Jury Could Find That the VOA's Stated Reason for Terminating Him was Pretext for Retaliation**

To establish a prima facie case for retaliation, Mr. Kurtiev alleges that: (1) he participated in a protected activity in January 2010 when he submitted the Badykova Witness Affidavit, Compl., ECF No. 1 at 10 ¶ 66; (2) he suffered a materially adverse action when he was terminated in April 2010, *see id*. at 25 ¶ 182; and (3) there is a causal link connecting the two because he was terminated after he questioned his immediate supervisor about the allegedly false reason he had been given about the nonrenewal of Ms. Badykova's contract. *See* Pl.'s Opp'n, ECF No. 36 at 3.

As with the discrimination claim, the VOA asserts the same reason for its termination decision: the results of its investigation of the incident in his office with Ms. Appel and Ms. Terterian. Having asserted a legitimate, non-retaliatory reason for the termination decision, the burden now shifts back to Mr. Kurtiev to demonstrate that the VOA's "stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation." *Walker*, 798 F.3d at 1092. And "the central question at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or

nonretaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Id.* (internal quotation marks and citation omitted).

To meet his burden, Mr. Kurtiev argues that: (1) he was terminated in retaliation for refusing to make false statements in the Badykova Witness Affidavit and for later questioning the reason he had been given for the nonrenewal of her contract, *see* Pl.'s Opp'n, ECF No. 36 at 11; (2) the two subordinate employees that made the accusation against him were disgruntled and blamed him for their shift assignment, *see id.* at 12-13; and (3) the VOA's review of the incident was a "sham investigation." *See id.* at 13.

### 1. Insufficient Evidence of Retaliation Arising From the Badykova Witness Affidavit

Mr. Kurtiev argues that he was terminated in retaliation for: (1) refusing to make false statements in his Witness Affidavit; and (2) raising questions about the reason he had been given for the non-renewal of Ms. Badykova's contract. Pl.'s Opp'n, ECF No. 36 at 10.

With regard to his refusal to make false statements in his Witness Affidavit, Mr. Kurtiev testified that Dr. Biberaj and Ms. Gandji, another VOA employee, "wanted [him] to include false[] information that [Ms. Badykova] didn't perform well in her position, and they wanted [him] to include false[]

information that she had conduct issues." Pl.s' Ex. 6, ECF No. 36-4 at 138:1-5. Mr. Kurtiev's affidavit stated that "[a]lthough her performance was not stellar, Ms. Badykova's contract . . . was not renewed because a decision was made to rely on stringers in [] Central Asia and the Caspian region." Defs.' Ex. A, ECF No. 32-3 at 5.

Mr. Kurtiev also states that VOA officials "wanted [him] to include that [he] was the [person] who made the decision," not to renew Ms. Badykova's contract, Pl.s' Ex. 6, ECF No. 36-4 at 140:15-17; whereas even though he was Ms. Badykova's supervisor, he claims that the decision to not renew her contract was made by Dr. Biberaj and Ms. Gandji, *id.* at 140:3-5.

With regard to his questioning the real reason for the non-renewal of Ms. Badykova's contract, Mr. Kurtiev states that in February 2010, after he signed the Witness Affidavit on January 15, 2010, he found evidence suggesting that the reason he had been given for the non-renewal of Ms. Badykova's contract—lack of funds—was not true. *Id.* at 11. Mr. Kurtiev states that he confronted Dr. Biberaj, who responded with a look of "extreme interest and concern" and told him not to worry about it. Pl.'s Ex. 6, ECF No. 36-4 at 149:18.[5] Mr. Kurtiev then states that in

---

[5] The Court notes that Mr. Kurtiev's deposition testimony does not support counsel's characterization that Dr. Biberaj was "visibly upset." Pl.'s Opp'n, ECF No. 36 at 11.

late February or early March 2010, he found evidence that strongly suggested that the lack of funds rationale was false and that after confronting Dr. Biberaj about it in late February or early March 2010, Dr. Biberaj threatened to terminate him. Pl.'s Opp'n, ECF No. 36 at 11. In support, Mr. Kurtiev cites his own deposition testimony where he avers that in response to his confronting Dr. Biberaj, Dr. Biberaj asked him whether he missed two former employees, which Mr. Kurtiev took to be a threat that he "could join them outside the Russia Service." Pl.'s Ex. 6, ECF No. 36-4 at 150:13-17. Mr. Kurtiev argues that soon thereafter, the first steps to terminate his employment were taken. Pl.'s Opp'n, ECF No. 36 at 11. Mr. Kurtiev argues that his dismissal "was in close temporal proximity to [his] protected activity of opposing discrimination by refusing to make knowingly false statements in his affidavit in the Badykova Case" and "in closer temporal proximity to his confronting Mr. Biberaj." *Id.*

The VOA argues that Mr. Kurtiev's retaliation claim fails for several reasons:[6] (1) "any inference of retaliation is undercut

---

[6] The Court is unpersuaded by defendants' technical argument that during his deposition, Mr. Kurtiev was unable to "identify a single place in his *Badykova* affidavit where [Dr.] Biberaj or Gandji suggested he include information that he refused to include." Defs.' Reply, ECF No. 37 at 20. It is clear that Mr. Kurtiev's contention is that he was pressured into including the statement that Ms. Badykova "was not a stellar performer" and to state that he was the decisionmaker in the Witness Affidavit.

by the lack of temporal proximity"; (2) "any reliance on temporal
proximity here is made even weaker by the absence of any other
evidence suggesting a retaliatory motive"; (3) he has not shown a
connection between any alleged impropriety in various official's
review of his Witness Affidavit and his termination; (4) he
fails to connect his termination to Dr. Biberaj's alleged threat
to terminate him; and (5) he "cannot demonstrate the requisite
knowledge of the protected activity." Defs.' Reply, ECF No. 37 at
20-22.

The question at this juncture is whether Mr. Kurtiev has
"put forward enough evidence to defeat the proffer and support a
finding of retaliation." *Woodruff v. Peters*, 482 F.3d 521, 530
(D.C. Cir. 2007). Mr. Kurtiev argues that the temporal
proximity—two months or less between his signing of the Witness
Affidavit, confronting Mr. Biberaj about the reason he had been
given for the non-renewal of Ms. Badykova's contract, and when
the decision to fire him was made—establish a prima facie case
of retaliation. Pl.'s Opp'n, ECF No. 36 at 12.[7]

"The temporal proximity between an employee's protected
activity and [his] employer's adverse action is a common and
often probative form of evidence of retaliation." Walker, 798

---

[7] Mr. Kurtiev appears to misunderstand his burden at this
juncture. His burden is not to argue that he has stated a prima
facie case; it is to "put forward enough evidence to defeat the
proffer and support a finding of retaliation." *Woodruff*, 482
F.3d at 530.

F.3d at 1092) (citing *Hamilton,* 666 F.3d at 1357–59); *Taylor v. Solis,* 571 F.3d 1313, 1322 (D.C. Cir. 2009). "Whether evidence offered to show that an employer's explanation is false itself suffices to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry." *Id.* (citing *Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("[I]t is difficult, if not impossible, to say in any concise or generic way under what precise circumstances such an inference will be inappropriate."). Assuming that two months or less would be sufficient to support an inference of temporal proximity, *Clark Cnty. Sch. Distr. v. Breeden*, 532 U.S. 268, 273 (2001); at the summary judgment stage, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff*, 482 F.3d at 530. And "[t]he evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

Here, a reasonable jury could not disbelieve the VOA's reasons and conclude that Mr. Kurtiev's termination was retaliatory. Mr. Kurtiev's contention—that he was retaliated against because he refused to state in the Witness Affidavit that Ms. Badykova was a poor worker and had conduct issues, but stated instead that "she was not a stellar worker" and because

he was pressured into stating that he made the decision to terminate Ms. Badykova—is belied by the fact that the Witness Affidavit contains the information Mr. Kurtiev alleges he was pressured to include. Assuming he was in fact pressured to include this information, Mr. Biberaj and Ms. Gandji achieved their objective, giving them no reason to retaliate. To the extent Mr. Kurtiev argues that they retaliated against him two months later because of their frustration in having had to pressure him, Mr. Kurtiev offers no evidence other than his opinion, which is insufficient to overcome the presumption that the VOA's reason was legitimate. *See Hastie v. Henderson,* 121 F. Supp. 2d 72, 77 (D.D.C. 2000), *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001) ("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"). Similarly, Mr. Kurtiev's interpretation of Mr. Biberaj's statement as a threat to terminate him for raising questions about the reason for the non-renewal of Ms. Badykova's contract is insufficient to raise a genuine issue of material fact for a jury. *See id*. Mr. Kurtiev's arguments that it was improper for Mr. Biberaj and Ms. Gandji to have reviewed his Witness Affidavit and to have not informed him that Ms. Badykova named them in her EEO complaint, and that it was improper for LER and

34

General Counsel staff to have reviewed it fail to "put forward enough evidence to defeat the proffer and support a finding of retaliation," *Woodruff*, 482 F.3d at 530; because he has provided no evidence that shows a connection between these alleged improprieties and his termination. Finally, Mr. Kurtiev has provided no evidence indicating that the persons other than Mr. Biberaj who were involved in the decision to terminate him—Ms. Grace, Mr. Lennon, Mr. Redisch, Mr. Austin, and Ms. Elliott—had any knowledge of Mr. Kurtiev's involvement in the Badykova Witness Affidavit.

For all of these reasons, Mr. Kurtiev has failed to provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

### 2. Insufficient Evidence of Retaliation Based on Ms. Appel and Ms. Terterian Being Unhappy About Their Shift Pick

Next, Mr. Kurtiev contends that the two subordinate employees who made the accusation against him were disgruntled because of the shifts they received. Mr. Kurtiev cites his own testimony to assert that the two employees "were very combative and threatened [him] with trouble if he did not change the shifts they were assigned to under the shift picks." Pl.'s Opp'n, ECF No. 36 at 13. However, the testimony Mr. Kurtiev

cites does not support his assertion that they threatened him. Rather, Mr. Kurtiev testified that Ms. Terterian asked her questions about the shifts in a "combative way." Pl.'s Ex. 6, ECF No. 26-4 at 172-173. Mr. Kurtiev points to the summary of the interview of Russian Service employee Daria Kutkovaya, who stated "that people would have personal offense against him and accuse him of something because of the shift picks." Pl.'s Opp'n, ECF No. 36 at 12. However, Ms. Kutkovaya's personal opinion does not create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext. *See Hastie,* 121 F. Supp. at 72.

Additionally, the VOA considered and rejected Mr. Kurtiev's argument about Ms. Appel and Ms. Terterian's motivations: "I find your arguments that Ms. Appel and Ms. Terterian have personal reasons to make false allegations against you are without merit. You have not shown how these accusations would benefit either Ms. Appel or Ms. Terterian. In fact, the complaint did not result in an adjustment to either employee' [sic] schedule or shift." Defs.' Ex. Y, ECF No. 32-27 at 3-4.

Mr. Kurtiev also asserts that the two employees' stories about the March 10, 2010 incident "changed over time." Pl.'s Opp'n, ECF No. 36 at 13. His support for this assertion is Ms. Roushanian's March 11, 2010 email describing the call she

36

received from Ms. Terterian and stating that the phrase included the word "have," Ms. Terterian's March 11, 2010 email to Ms. Appel in which she translated the phrase as including the "f" word, and that the investigation showed a split among employees as to whether Mr. Kurtiev makes offensive statements. *Id.* Mr. Kurtiev also asserts that Ms. Appel and Ms. Terterian "testified differently during their depositions as to what was said and its translation." ECF No. 40 at 7 ¶ 39. As the Court explained *supra*, although the record contains slight deviations in the translation of the phrase, those deviations do not change the sexual connotation of the phrase. Accordingly, these slight deviations do not create a genuine issue of material fact from which a reasonable jury could conclude that the VOA's reasons for terminating Mr. Kurtiev were pretext. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

For all of these reasons, Mr. Kurtiev has failed to provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

### 3. Insufficient Evidence of Retaliation Based on the Investigation

Mr. Kurtiev raises a number of complaints about the investigation to argue that the investigation of the incident

was a "sham." Pl.'s Ex. 10, ECF No. 36-7. The question at this juncture is whether Mr. Kurtiev has "presented sufficient evidence to attack the employer's proffered explanations for its actions" by "call[ing] into question whether [Defendants'] investigation was a reasonably objective assessment of the circumstances or, instead, an inquiry colored by . . . discrimination" or retaliation. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 853 (D.C. Cir. 2005).

Mr. Kurtiev complains that the decision to terminate his employment was made before the investigation was complete because he was notified of the decision before he was given the opportunity to respond to the complaint against him. Pl.'s Opp'n, ECF No. 36 at 13. However, the evidence shows that LER staff met with Mr. Kurtiev on March 11, 2010 to inform him of the complaint made against him and that he denied that he made the statement. Defs.' Ex. S, ECF No. 32-21 at 2. LER staff then conducted the investigation from March 11, 2010 through March 18, 2010. Defs.' Ex. K, ECF No. 32-13 at 62:19-20.

*Mastro* is instructive. In *Mastro*, the D.C. Circuit reversed the district court's grant of summary judgment in favor of the defendants, "conclud[ing that the plaintiff] raised a genuine issue of material fact concerning the legitimacy of [the defendants'] nondiscriminatory reason for termination" based on the investigation that was conducted into the incident and that

38

lead to the plaintiff's termination. *Mastro*, 447 F.3d at 72. The D.C. Circuit pointed to record evidence suggesting that the investigation, "which was central to and culminated in [the plaintiff's] termination, was not just flawed but inexplicably unfair" because: (1) the plaintiff himself was not interviewed; and (2) "careful, systematic assessments of credibility" were not performed. *Id.* at 80. Here, by contrast, Mr. Kurtiev was interviewed on the day after the incident occurred. And Ms. Munn made credibility determinations based on her "discussions with Ms. Appel and Ms. Terterian, Ms. Terterian's emotional state, [and] the translation of the statement that each member of the Russian Service translated to being the same." Defs.' Ex. K, ECF No. 32-13 at 73:11-16.

The record shows that Mr. Kurtiev, at his request, met with Ms. Munn during the afternoon of March 22, 2010, Defs.' Ex. B, ECF No. 32-4 at 220:6-7; after Mr. Austin decided on March 19, 2010 that his employment should be terminated, Defs.' Ex. X, ECF No. 32-26 at 2. Given that after Mr. Kurtiev was given notice of his termination in a letter dated March 24, 2010, he was able to seek reconsideration of that decision and did so with the assistance of counsel, Defs.' Ex. Y, ECF No. 32-27; Defs.' Ex. CC, ECF No. 32-31; the Court cannot find that the March 22, 2010 meeting between Mr. Kurtiev and Ms. Munn calls into question

whether the "investigation was a reasonably objective assessment of the circumstances . . ." *Mastro*, 447 F.3d at 853.

Mr. Kurtiev also asserts that Ms. Munn did not request a description of the incident from Ms. Appel and Ms. Terterian. Pl.'s Opp'n, ECF No. 36 at 14. However, the record shows that on March 11, 2010, Ms. Terterian forwarded to Ms. Munn an email discussion between Ms. Terterian and Ms. Munn describing the incident. Pl.'s Ex. M at 2. Mr. Kurtiev complains that the "investigation was not thorough" because Ms. Appel was never interviewed and Ms. Terterian was interviewed only telephonically. Pl.'s Opp'n, ECF No. 36 at 16. However, the record shows that both Ms. Appel and Ms. Terterian were interviewed in person. Pl.'s Ex. 33, ECF No. 36-14 at 51:14-16; Defs.' Ex. S, ECF No. 32-21 at 2. Mr. Kurtiev disputes that Ms. Munn met with Ms. Terterian in person because Ms. Munn's notes of the meeting include Ms. Terterian's telephone number. However, as Ms. Munn explained, she wrote Ms. Terterian's telephone number on her notes so that she could reach her while she was on administrative leave. Pl.'s Ex. 33, ECF No. 36-14 at 55:3-7. He also disputes that Ms. Munn met with Ms. Appel in person because no notes of the meeting with Ms. Appel have been produced despite Ms. Munn's statement in her deposition that she "takes notes for every meeting." *Id*. at 54:16-55:7; 53:4. However, Mr. Kurtiev provides no positive evidence to support

his allegations and his arguments are based on an inaccurate understanding of the record. Accordingly, he fails to "call into question whether [Defendants'] investigation was a reasonably objective assessment of the circumstances." *Mastro*, 447 F.3d at 853.

Mr. Kurtiev's expert criticized the investigation for not investigating Mr. Kurtiev's defenses, or his allegations about Ms. Appel and Ms. Terterian's motivations prior to the March 24, 2010 decision. Pl.'s Opp'n, ECF No. 36 at 14. Along the same lines, Mr. Kurtiev complains that the VOA did not investigate whether Ms. Appel and Ms. Terterian conspired to get Mr. Kurtiev fired. *Id*. at 17. However, Mr. Kurtiev points to no evidence in the record indicating that he made Ms. Munn aware of his defenses or allegations when he met with her and other LER staff on March 11, 2010. And in making its final decision in response to Mr. Kurtiev's request for reconsideration, the VOA did take into account Mr. Kurtiev's evidence of alternate translations of the phrase as well as his allegations about Ms. Appel's and Ms. Terterian's motivations. Specifically, the VOA took into consideration the alternate translation of the phrase provided by Mr. Kurtiev, but found the translation of the phrase that has a sexual connotation to be more credible. Defs.' Ex. Y, ECF No. 32-27 at 3. And as stated above, the VOA also noted that the "poor judgment [Mr. Kurtiev] displayed in making this statement

and by attempting to provide a false translation to mitigate [his] misconduct lead me to conclude that [his] removal from federal service is justified and necessary." *Id.* at 3-4. Also as stated above, the VOA also considered and rejected his argument about Ms. Appel and Ms. Terterian's motivations: "I find your arguments that Ms. Appel and Ms. Terterian have personal reasons to make false allegations against you are without merit. You have not shown how these accusations would benefit either Ms. Appel or Ms. Terterian. In fact, the complaint did not result in an adjustment to either employee' [sic] schedule or shift." *Id.*

Mr. Kurtiev raises a number of additional miscellaneous complaints about the investigation based on the report of his expert. However, none of these complaints call into question whether the "investigation was a reasonably objective assessment of the circumstances . . . ." *Mastro*, 447 F.3d at 853. Mr. Kurtiev complains that he did not have the opportunity to engage in "meaningful discussions" until after the termination decision had been made. Pl.'s Opp'n, ECF No. 36 at 16. However, Mr. Kurtiev was informed of the complaint and provided an opportunity to respond on the day the investigation began. Moreover, he was able to engage in meaningful discussions during the VOA's reconsideration of the decision, and did so with the advice of counsel. And the record indicates that the VOA considered his arguments carefully.

Mr. Kurtiev complains that the VOA did not investigate whether Ms. Appel and Ms. Terterian themselves used the phrase. Pl.'s Opp'n, ECF No. 36 at 16-17. However, whether or not they used the phrase is not relevant to the propriety of Mr. Kurtiev using the phrase during the meeting with them. Mr. Kurtiev complains Ms. Munn asked leading questions and that the VOA did not investigate whether the translation of the phrase was accurate. Pl.'s Opp'n, ECF No. 36 at 17. He also argues that the VOA should have found "an individual fluent in Russian who had no relationship or connection with the complainants or the accused (and therefore no conflict of interest) and who could have provided an unbiased translation." Pl.'s Opp'n, ECF No. 36 at 17. Mr. Kurtiev's objection to the questions that were posed during the investigation do not "call into question whether [Defendants'] investigation was a reasonably objective assessment of the circumstances." *Mastro*, 447 F.3d at 853. And the evidence shows that VOA obtained sixteen translations by Russian Service employees, including employees who performed translations as part of their day-to-day responsibilities, unanimously translating the phrase as having a sexual connotation. Furthermore, some of those employees showed support for Mr. Kurtiev's leadership. Mr. Kurtiev complains that some of the Russian Service employees who were interviewed "expressed distain for Mr. Kurtiev based on his national origin." However,

43

assuming some Russian Services employees expressed distain, the employees were unanimous in translating the phrase as having a sexual connotation. Accordingly, even employees who did not allegedly express distain for him translated the phrase as having a sexual connotation.

Mr. Kurtiev complains that the record does not indicate that Ms. Munn or anyone assisting her evaluated the reliability and credibility of the persons interviewed. Pl.'s Opp'n, ECF No. 36 at 17. However, Ms. Munn testified that she made credibility determinations based on her "discussions with Ms. Appel and Ms. Terterian, Ms. Terterian's emotional state, [and] the translation of the statement that each member of the Russian Service translated to being the same." Defs.' Ex. K, ECF No. 32-13 at 73:11-16.

Finally, Mr. Kurtiev speculates that Ms. Munn and other high-ranking VOA officials "may" have been biased against Mr. Kurtiev. Pl.'s Opp'n, ECF No. 16-19. However, such speculation is insufficient to create a factual issue of pretext. *See Hastie,* 121 F. Supp. 2d at 77.

Accordingly, since Mr. Kurtiev failed present evidence from which a reasonable jury could find that he was terminated in retaliation for issues surrounding the Badykova Witness Affidavit, that the allegations against him were fabricated, or that the investigation was not a "reasonably objective

assessment of the circumstances," *Mastro*, 447 F.3d at 853, the Defendants' motion for summary judgment on this claim is **GRANTED**.

### C. Mr. Kurtiev is Entitled to a Weak Adverse Inference

Mr. Kurtiev asserts that documents relating to this case—specifically documents relating to edits made to the Badykova Witness Affidavit—were not preserved when the hard drive of his computer was "wiped clean." Pl.'s Opp'n, ECF No. 36 at 9. Mr. Kurtiev states that no litigation hold was placed by the Office of General Counsel nor by the VOA's EEO office. *Id*. As a result, Mr. Kurtiev asks the Court to "conclude that there was spoliation and that a negative inference is warranted." *Id*. at 10.

A party has "an obligation to preserve and also to not alter documents it knew or reasonably should have known were relevant to the . . . litigation if it knew the destruction or alteration of those documents would prejudice the [other party]." *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995). "[A] negative inference may be justified where the defendant has destroyed potentially relevant evidence." *Gerlich v. Dep't of Justice*, 711 F.3d 161, 265 (D.C. Cir. 2012). The duty to preserve arises when litigation is reasonably foreseeable. *Id*. at 265-66. "Once a court has determined that future litigation was reasonably foreseeable to the party who

destroyed relevant records, the court must then assess . . . whether the destroyed records were likely relevant to the contested issue." *Id.* at 266.

Here, litigation was reasonably foreseeable since the record indicates that Mr. Kurtiev was represented by counsel during his request for reconsideration of the March 24, 2010 Notice of Termination of Appointment. *See e.g.*, Defs.' Ex. AA, ECF No. 32-29. Moreover, his counsel's April 8, 2010 letter to the VOA raised the possibility of an EEO retaliation claim. Pl.'s Ex. 12, ECF No. 36-9 at 9-10. Accordingly, the Court must assess "whether the destroyed records were likely relevant to the contested issue." *Gerlich*, 711 F.3d at 266. "[I]n situations where 'the document destruction has made it more difficult for a party to prove that the documents destroyed were relevant,' the 'burden on the party seeking the adverse inference is lower,' and 'the trier of fact may draw such an inference based even on a very slight showing that the documents are relevant.'" *Gerlich*, 711 F.3d at 267 (quoting *Ritchie v. U.S.,* 451 F.3d 1019, 1025 (9th Cir. 2006)). Mr. Kurtiev asserts that "[these documents were highly relevant to the issue of motive, among other things." Pl.'s Opp'n, ECF No. 36 at 9. The inference he requests is that VOA officials, "at a minimum," Mr. Biberaj and Ms. Gandji, had a retaliatory motive or a retaliatory intent. *Id.* at 10.

Mr. Kurtiev's theory of relevance is unclear. If it is that the destroyed documents would have shown that the versions of the affidavit that showed Mr. Biberaj and Ms. Gandji's edits would provide evidence that Mr. Biberaj and Ms. Gandji had reason to retaliate against him, Mr. Kurtiev is entitled to only a weak inference because as the Court explained above, to the extent they pressured him to say that Ms. Badykova "was not a stellar performer" and that Mr. Kurtiev made the decision to fire her, they achieved their objective and so would have no reason to retaliate against him. On the other hand, if his theory is that the different versions of the affidavit would have shown that it was improper for VOA officials to have played a role in editing the affidavit, he is entitled to only a weak inference because he has not provided any evidence linking the editing process to his termination. Neither of these weak inferences are strong enough to provide evidence from which "a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093.

## V.   Conclusion

Drawing every justifiable inference in Mr. Kurtiev's favor, as the Court must, it finds no basis upon which a reasonable factfinder could conclude that the VOA had discriminatory intent

based on his national origin and/or religion, or was retaliating against Mr. Kurtiev for taking part in a protected activity when it terminated him. Accordingly, the Defendants' Motion for Summary Judgment is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **June 1, 2020**